■ In *Howell v. Cataldi,* 464 F.2d 272, 279 (3d Cir. 1972), the court stated that a plaintiff must establish

1. Intentional performance of conduct
2. Amounting to punishment which is
   a. cruel, and
   b. unusual

in order to sustain a claim of deprivation of Eighth Amendment rights. The standard used to determine whether the punishment

is cruel and unusual is whether it "is sufficiently severe in the circumstances to shock the conscience of a reasonable man". *Bethea v. Crouse,* 417 F.2d 504 (10th Cir. 1969). Punishment has been defined to include actions "deliberately administered for a penal or disciplinary purpose . . .". *Johnson v. Glick,* 481 F.2d 1028 (2d Cir. 1973).

■ It is clear from the facts found by this Court that defendants did not deprive plaintiff of his constitutional rights. Defendants' actions in extinguishing the fire did not constitute punishment. Defendants did not refuse to allow plaintiff to leave the cell. The cell door was open. It was the fire that blocked plaintiff's exit from the cell. Defendants did all that they could under the emergency conditions that existed to prevent serious injury to plaintiff. The facts as adduced at trial simply do not constitute a violation of the Eighth Amendment.

Judgment will be entered for defendants.

**Walter D. MORITZ and Frank Edward Nichols, Plaintiffs,**

v.

**The MEDICAL PROTECTIVE COMPANY, OF FORT WAYNE, INDIANA, a corporation, Defendant.**

No. 76–C–339.

United States District Court, W. D. Wisconsin.

Feb. 22, 1977.

Myron M. Cherry by Peter A. Flynn, Chicago, Ill., for plaintiffs.

Boardman, Suhr, Curry & Field, Bradway A. Liddle, Madison, Wis., for defendant.

JAMES E. DOYLE, District Judge.

This is a civil action in which the plaintiff seeks monetary, declaratory and injunctive relief. Plaintiffs are doctors who were insured by the defendant against liability accruing from medical malpractice suits. Plaintiffs complain that defendant breached this insurance contract by refusing to prosecute an appeal in a case in which judgment was entered against the doctors in a state trial court, and that defendant threatens similar wrongs. Jurisdiction is present. 28 U.S.C. § 1332(a).

This opinion and order responds to a motion by plaintiff to bar all members of the Madison, Wisconsin, law firm of Boardman, Suhr, Curry and Field (the Boardman firm) from representing the defendant in this action on the grounds that: (1) such representation would result in the disclosure of confidential information which plaintiff gave to a member of the Boardman firm in another lawsuit; (2) such representation would put the Boardman firm in the position of representing interests of clients which are in conflict; and (3) such representation would create the appearance of impropriety.

On the basis of the pleadings and affidavits submitted, and only for the purpose of deciding the motion to bar the Boardman firm from participation, I find the facts set forth in the section entitled "Facts."

## Facts

Plaintiffs (the doctors) are orthopedic surgeons. Defendant (MPC) is a stock insurance company engaged in providing insurance to physicians and surgeons.

The doctors and MPC entered into two contracts covering the calendar years 1973 and 1974. The contracts provided, among other things, that: MPC would defend and pay damages (within stated monetary limits) in the name of the insured in cases involving medical malpractice claims. Upon MPC's receipt of notice from the insured that a claim had been made or was threatened, MPC "shall immediately assume its responsibility for the defense of any such claim and shall retain legal counsel, who shall defend in conjunction with the legal department of the Company." The defense costs would be paid by MPC. The insured would notify MPC immediately of any threatened claim, provide full information concerning the medical services in question, and cooperate fully in the defense.

Sometime in 1973, Katherine and John Schofield filed claims against the doctors alleging that the doctors had negligently performed certain medical services. Pursuant to the insurance contract then in effect, MPC appointed counsel (other than the Boardman firm) to represent the doctors in that action. On January 6, 1976, a judgment was entered in favor of the Schofields and against the doctors for a substantial amount of money. The doctors asked their counsel in that case to appeal the judgment, but MPC and the counsel refused to take this appeal. MPC then paid to the Schofields the amount of the judgment and filed a satisfaction of judgment.

From about September, 1974, to the present, Bradway A. Liddle of the Boardman firm has been primary counsel for MPC in Dane and surrounding counties and has handled most, if not all, of the actions commenced during this period against MPC "and/or" its insureds.[1]

On February 19, 1976, Moritz and Nichols tendered to MPC defense of another law-

---

1. The findings contained in this paragraph are based on the language of uncontested allegations in an affidavit by Liddle. They leave ambiguity whether Liddle represented MPC as

suit against Moritz arising from alleged negligence in rendering professional services. *Jacobson v. Moritz* (Dane County Circuit Court, Case No. 150–236). In late February or early March of 1976, again pursuant to the applicable insurance contract, MPC referred the defense of the *Jacobson* case to the Boardman firm and, in particular, to Liddle. Liddle prepared and served an answer to the complaint.[2]

On March 30, 1976, MPC informed Moritz that the Boardman firm had been retained by MPC to defend the *Jacobson* case and that Liddle, in particular, would be representing him. In a telephone call to Liddle by Moritz on or about April 7, 1976: (1) Moritz inquired about Liddle's view as to Liddle's duty to defend Moritz, as contrasted with MPC, in the *Jacobson* case; (2) Moritz discussed the facts of the *Jacobson* case; and (3) Moritz advised Liddle that MPC had paid a judgment against him in another suit without taking an appeal, and that Moritz was contemplating bringing suit against MPC on the ground of breach of contract.[3] Moritz was satisfied by the assurance Liddle gave him that Liddle and the Boardman firm would remain loyal to Moritz in the *Jacobson* case.

On May 25, 1976, Moritz and Nichols filed the complaint against MPC in the present case in this court and it was served upon MPC the same day. That complaint contains two counts related to the refusal to take the appeal in the *Schofield* case. It contains a third count which incorporates by reference certain allegations from the first and second counts, and then continues with additional allegations to the following effect:

In September 1975, MPC declined to issue any further liability insurance to these two doctors, but MPC remains obliged to perform under the policy against claims for liability arising from events which occurred during the policy periods. One such claim is the *Jacobson* claim, and MPC has accepted the tender of the defense against this claim. However, because of the conduct of MPC with respect to the *Schofield* claim, the doctors do not believe that MPC will act fairly either in appointing lawyers who will represent the independent interest of these doctors or in pursuing or authorizing appeals from adverse judgments. MPC intends, instead, in connection with the defense of claims against the doctors, to make deci-

its attorney in matters other than the defense of malpractice claims against its insureds, whether he represented MPC when MPC was named as a party defendant in cases embodying claims that its insureds had engaged in malpractice, and whether he considers that he was "counsel for MPC" in cases in which only the insureds were named as parties defendant and which embodied claims that the insureds had engaged in malpractice.

2. Although it is not explicit in this record, I infer, and find, that the answer in *Jacobson* was served prior to April 7. Nor does the record in this case reveal whether MPC is a named defendant in *Jacobson*; I infer, and find, that it is not.

3. In an affidavit filed with the motion to bar the Boardman firm from representing MPC in this present action, plaintiff Moritz alleges that in this April 7 phone conference: "I also disclosed to Mr. Liddle the problems which I have had with the Company [MPC] including the *Schofield* problems outlined in the Verified Complaint, and I discussed with Mr. Liddle other matters concerning my problems with and relationship with the Company." Also, the affidavit alleges that Liddle had "gained knowledge

from me on factual matters in an attorney-client relationship (some of which involve factual matters which are the subject of contest in this litigation) . . . ." Also, the affidavit alleges "that in conversations and communications with me while Mr. Liddle was acting as my attorney, he learned and received factual information, on an attorney-client basis, which would be useful to the Company he now seeks to defend." In an answering affidavit, Liddle alleges that the April 7 phone call from plaintiff Moritz was his only conversation with Moritz. In it Moritz inquired about Liddle's view as to Liddle's duty to defend Moritz, *vis-a-vis* MPC, in the *Jacobson* case; Moritz discussed the facts of the *Jacobson* case and indicated that Jacobson had brought suit against the wrong doctor; and Moritz advised Liddle that MPC had paid a judgment entered against Moritz in another suit and that Moritz was contemplating bringing a breach of contract suit against MPC. The affidavit alleges further that Moritz did not discuss the *Schofield* situation and did not give Liddle any specific facts or details which could be considered confidential or secret.

sions solely in the interest of MPC without regard to the interests of the doctors. MPC intends to take steps to hurt these doctors' interests, including their practice and reputation, in connection with the *Jacobson* claim and other claims which may be filed in the future relating to events which occurred during the policy periods. The steps which MPC may take to damage the doctors' practice and reputation are "so varied, subtle, and discrete" that the doctors' interests can be protected only by an injunction preventing MPC from continuing to breach its obligation of loyalty and defense to the doctors and by an injunction permitting the doctors to retain counsel of their own choice, but at MPC's expense, to defend covered claims against the doctors.

When Liddle became aware of the allegations of the complaint in the present case in this court, including those which appear to allege that counsel retained by MPC in the *Jacobson* case would be unfaithful to Moritz' interests and that Moritz' interests could be protected only by counsel chosen by Moritz, Liddle decided to withdraw from the *Jacobson* case and he accepted MPC's invitation to represent MPC in the defense of the present case. Between May 25 and June 15, 1976, Liddle drafted an answer for MPC in the present case and also a letter to Moritz advising Moritz of Liddle's desire to withdraw as Moritz' attorney in defense of the *Jacobson* case, advising Moritz that MPC had retained another lawyer to serve as Moritz' attorney in *Jacobson*, and enclosing papers for the substitution of the other lawyers for the Boardman firm as Moritz' attorneys in *Jacobson*. The answer by MPC in the present case in this court was served by mail on June 15. The letter to Moritz was dated and mailed June 16. This sequence occurred because the MPC answer

was typed before the letter to Moritz was typed.

### Opinion

Plaintiffs' motion for the disqualification of the Boardman firm in the instant case is based principally on Canons 4, 5, and 9 of the Code of Professional Responsibility (CPR) of the American Bar Association.[4] It is not completely clear whether when exercising its diversity jurisdiction, a federal court must look to the substantive law of the state in which it sits in deciding questions of the conduct of the attorneys appearing before it, or may exercise its own judgment in conflict with or more stringently than the rules adopted by the state. *See, e. g., Cord v. Smith*, 338 F.2d 516, 524 (9th Cir. 1964), *aff'd on rehearing*, 370 F.2d 418 (9th Cir. 1966). I need not definitively resolve this question since I intend to look to the CPR and since the relevant provisions of CPR (but not the footnotes prepared by the American Bar Association's Special Committee) have been adopted by the Wisconsin Supreme Court (with amendments not relevant here) pursuant to Wis. Stat.Ann. § 256.29(2) (App.1971), January 1, 1970.

### I.  Canon 4:  The Preservation of the Confidences and Secrets of a Client.

Ethical consideration (EC) 4–1 of Canon 4 opens with this sentence: "Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him." EC 4–5 of Canon 4 closes with this sentence: "Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to anoth-

---

**4.** Plaintiffs also appear to rely on CPR Disciplinary Rule 2–103(D)(4) (which is related to Canon 2) as a basis for disqualification of the Boardman firm from representation of MPC in this present lawsuit. I appreciate that if DR2–103(D) is construed to apply to liability insurers and their insureds, then this section, and perhaps particularly subsections (d) and (e) may be of significance to the issues in this

present lawsuit as between the doctors and MPC. But if applicable at all, DR 2–103(D)(4) would bear on the conduct of the defense of malpractice claims against the doctors and not upon the conduct of MPC's defense of this present suit by the doctors in this court; that is, MPC has retained Liddle directly to represent its interests and only its interests in the present suit in this court.

er, and no employment should be accepted that might require such disclosure."

Disciplinary Rule 4–101(A) defines "confidence," for the purpose of Canon 4 and the related disciplinary rule (DR), as "information protected by the attorney-client privilege under applicable law," and it defines "secret" as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

DR 4–101(B) of CPR provides:

Except when permitted under DR 4–101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

The rationale underlying Canon 4 is that a client should feel free to communicate all possibly relevant information to his lawyer. See Canon 4, notes 1 and 2. If attorneys are permitted to reveal such confidences and secrets or make use of such information in the interest of a party other than the confider, without the consent of the confider, the free flow of information from client to attorney will be discouraged and even destroyed. *Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1384–85 (3d Cir. 1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). This danger to the attorney-client relationship, as an institution, is outweighed only by the presence of a narrow category of justifications for unconsented to disclosure.

Among a number of questions under Canon 4 raised by the doctors' motion to disqualify Liddle, those which are central relate to: (a) the nature of the interrelationships among Moritz, Liddle, and MPC as of the April 7 phone call from Moritz to Liddle; and (b) the nature of the information allegedly imparted by Moritz in that call and claimed to have constituted "confidences" or "secrets," or both, within the meaning of Canon 4.

Question (a) presents inherent difficulty: it is difficult to enunciate a definition of the relationships among a liability insurer, its insured, and a lawyer chosen by the insurer to defend a claim against its insured. But question (a) presents a special difficulty in the context of this present lawsuit: while a decision on the merits of the present lawsuit may require this court to enunciate a definition of these interrelationships, a decision on this preliminary and ancillary motion itself requires such an enunciation.[5]

There are to be examined the relationships: between MPC and Moritz (and Nichols); between Liddle and Moritz; and between MPC and Liddle.

As of April 7, the relationship between MPC and the doctors was defined by the terms of the policy. I have made findings, above, with respect to the content of the policy. I construe the policy in this case to provide: that when the insured elects to tender to the insurer the defense of a claim against him or her, he or she consents to having the insurer choose the lawyer who is to defend the claim; and that the insurer is entitled then to control the defense by taking charge of the incidents of the defense including the supervising of the litigation. See 7A Appleman, *Insurance Law and Practice* § 4681; 14 *Couch on Insurance 2d* 51:103; Formal Opinion No. 282, May 27,

---

5. This is to be regretted. These basic issues have been inadequately explored in connection with the motion to disqualify, and the record thus far made in this case is skimpy. It is quite possible, even probable, that some of the views I express in deciding the doctors' motion to disqualify Liddle may be modified in the course of deciding the underlying lawsuit. In any

event, resolution of the present motion does not appear to require resolution of the question whether control of the decision to appeal an adverse judgment (as in the *Schofield* case) rests with the insurer or with the insured in cases involving alleged malpractice by physicians.

1950, ABA Committee on Professional Ethics.

As of April 7, the relationship between Liddle and Moritz was that of attorney and client. *Ibid.*

█ As of April 7, the relationship between MPC and Liddle is more difficult to define. It was the relationship between the party (MPC) which had exercised its right of choice by choosing Liddle to represent Moritz, which had the obligation to compensate Liddle for his services in the case, which enjoyed the right to control and supervise the defense of the *Jacobson* suit, and which enjoyed the right to disclosure of all information in Moritz' possession relevant to the *Jacobson* suit, on the one hand, and, on the other, the attorney (Liddle) for a client (Moritz) who did not have the right to supervise the defense of the *Jacobson* suit and who owed to MPC the duty to disclose all information relevant to the *Jacobson* suit. The law and the canons of ethics defining and governing this relationship are surprisingly unclear. It appears that the insurer is considered by some authorities to be an employer rather than a client of the lawyer, but by others to be a client. See generally Conflicts of Interest in Insurance Practice, The Defense Institute, Inc., Vol. 1971, No. 5; Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, 1167–1173 (1954); and news release on "Guiding Principles" by the National Conference of Lawyers and Liability Insurers, December 1, 1969, The Defense Institute, Inc., Vol. 1971, No. 5, p. 30, at 31–32. Although I appreciate that ethical standards are often intended to compel an adaptation of reality to principle, rather than vice versa, I take judicial notice of the pervasive, long existing, and widely recognized reality concerning the lawyer's role in defending claims when liability insurance is present. I conclude that the relationship between the insurer and the lawyer of its choice is a relationship between client and attorney.

These interrelationships among a liability insurer, its insured, and the attorney chosen by the insurer to represent the insured, are *sui generis.* The canons and disciplinary rules do not address themselves frankly and explicitly to this special set of relationships, and there is awkwardness in attempts to apply the canons and rules. It has been said rather cheerfully that "a community of interest exists between the company and the insured" and that the "company and the insured are virtually one in their common interest." Formal Opinion No. 282, *supra.* Of course, there is a large measure of truth in this observation. But it cannot obscure the fact that the relationship between the liability insurer and the insured rests upon a hardboiled commercial transaction. The purchaser has a powerful need for protection against the potentially devastating effects of a large money judgment against him or her. The seller is prepared to provide that protection for a price, but, understandably, only on several conditions, including the right to full disclosure by the consumer, the right to choose the defense lawyer, and the right to control and supervise the defense. There is an inescapable tension for a lawyer, subject to ethical commands far more stringent than those of the insurance marketplace, who must be faithful to the interests of the insurer-client in control of the defense, and must also "represent the insured as his client with undivided fidelity." *Ibid.*

I conclude that with respect to the *Jacobson* case, as of April 7, Liddle was the common attorney of two clients, MPC and Moritz, and that the two sets of attorney-client relationships had come into being simultaneously. As of April 7, each of the clients was fully aware of the existence of both relationships.

█ With respect to the particular matter of "confidences" within the meaning of Canon 4,[6] communications by either client to Liddle concerning the subject matter of the *Jacobson* suit (namely, the nature

---

6. ". . . . information protected by the attorney-client privilege under applicable law.
. . . ."

and result of medical services rendered to Jacobson by Moritz, if any) were not privileged as to the other client and were not confidences. VIII Wigmore on Evidence (McNaughton Revision) § 2312. Nor were they "secrets" within the meaning of Canon 4.[7] There is no allegation that Moritz requested Liddle to hold any information "inviolate." Although it is surely conceivable in a malpractice case, that certain information imparted by the physician to the attorney might be embarrassing to the physician, or might be detrimental to the physician if it should fall into the wrong hands, the physician's contractual obligation to disclose the information to the insurer prevents the information from being considered a secret as to the insurer.

However, the conversation of April 7 proceeded on two levels. One portion was directed to the subject matter of the *Jacobson* suit. The second portion resembled a conversation between a prospective client and a lawyer, discussing arrangements that will affect the prospective client's decision whether to offer a retainer and the lawyer's decision whether to accept such an offer. I have already concluded that well before April 7, Liddle had become Moritz' attorney and Moritz had become Liddle's client. But even if this were not so, it appears that confidences and secrets imparted to a lawyer in a pre-retainer conversation are protected by Canon 4, which imposes a duty upon a lawyer to preserve the "confidences and secrets of one who has . . . sought to employ him." EC 4–1.

■ It was reasonable and proper for Moritz to discuss with Liddle points of concern to Moritz about his relationship to MPC and Liddle in the defense of the *Jacobson* suit. But Moritz had no reasonable

basis to expect that Liddle would withhold from MPC general information imparted to him in this context and relating to a history of difficulty between the doctors and MPC in the defense of malpractice claims. Indeed, it would have been necessary for Liddle to disclose to both his clients any general information obtained from either of them bearing on their working relationships in the defense of the *Jacobson* suit, so that it could be determined whether it was feasible to continue the relationships among the three. I conclude that general information of this kind was neither a "confidence" nor a "secret," within the meaning of Canon 4.

■ But different considerations are present if on April 7 Moritz imparted to Liddle details about the disagreement between the doctors and MPC with respect to the *Schofield* case or with respect to other specific cases. While MPC would undoubtedly be aware generally of such an episode or episodes and probably aware of certain details, it might well be unaware of other details. Thus, more focussed scrutiny would be required in order to determine whether certain information does or does not qualify as a "confidence" or "secret" within the meaning of Canon 4. If such confidences or secrets were in fact imparted to Liddle by Moritz, Liddle was bound to preserve them from MPC as well as from others, and it would be necessary for Liddle to refrain from representing MPC in a later lawsuit in which such information would be relevant.[8]

Given the analysis I have made, the entire issue could readily be resolved by fact finding with respect to exactly what was said by Moritz to Liddle on April 7. However, the courts have recognized that this

---

7. Information, other than "confidences," which has been gained in the professional relationship and which "the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

8. It appears that if an insured imparts to the lawyer information which would or might provide a basis for denying policy coverage—such as fraud in obtaining the policy—the lawyer is

bound not to disclose the information to the insurer, and to withdraw from representation of both the insurer and the insured. *See State Farm Mutual Automobile Insurance Co. v. Walker,* 382 F.2d 548, 552 (7th Cir. 1967); James P. Allen, Jr., Selected Conflicts of Interest Problems in Insurance Litigation, the Defense Institute, Inc., Vol. 1971, No. 5, p. 50, at pp. 51–52.

method of solution itself gives rise to difficulty.

If, to obtain disqualification of opposing counsel, a challenger were required to show that challenged counsel had actually received confidences and secrets from the challenger in the course of representing the challenger, it might be necessary in the process of making the challenge in court to disclose too fully the very information sought to be protected.[9] Some courts have responded to this difficulty by a device resembling a presumption. The propositions underlying this response are: (1) when a lawyer represents a client in litigation or in some other circumstance, confidences and secrets bearing on the subject matter of the representation will probably be imparted to the lawyer by the client; and (2) when the same lawyer later represents a second client whose interests are adverse to those of the first client, and when the subject matter of the later controversy is "substantially related" to the subject matter of the earlier representation, improper revelation or other improper use of the confidences and secrets may occur. Enforcement of the confidentiality requirement in such a situation, it has been said, requires that even without proof that confidences or secrets have actually been imparted, counsel must be prevented from representing the second client.[10] *T.C. Theater Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265, 268–269 (S.D.N.Y.1953); *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 570–571 (2d Cir. 1973); *Schloetter v. Railoc of Indiana,* 546 F.2d 706 (7th Cir. 1976).

█ Such a prophylactic rule appears generally sound and, of course, I am bound in any event to apply it to the extent previously decided upon by the court of appeals for this circuit. However, a party to litiga-

tion also has an important interest in enjoying the services of counsel of its choice, and the prophylactic rule ought not be applied so indiscriminately as to undercut this interest without justification.

█ I conclude, first, that I am not bound to apply the prophylactic rule here and, second, that I should not do so.

I am not bound to apply the rule because the subject matter of this present action in this court is not "substantially related" to the subject matter of the *Jacobson* case (namely, the nature and results of the medical treatment of Jacobson by Moritz, if any). The only relationship between the two cases is a relationship between the subject matter of the present case in this court, on the one hand, and the manner in which Moritz feared that MPC and perhaps Liddle might conduct themselves in the *Jacobson* case, on the other.

Free either to apply the rule or not to apply it, I decide not to apply it. I believe that the *T.C. Theater Corp.* rule arose from situations in which in the "first" case, the attorney represented A and only A; situations in which B played no part in the first case; situations in which there was no occasion in the context of the first case for A's attorney to disclose to B any information imparted by A to his or her attorney. In the circumstances present here, however, in which in the "first" case the attorney was the common attorney for A and B, there is something approaching a presumption that any information obtained by the attorney from either A or B might properly have been disclosed to the other. Therefore, the doctors in the present case in this court should not enjoy a presumption that in the *Jacobson* case, Moritz imparted to Liddle

---

9. As indicated below, however, I do not regard this problem as insoluble in all circumstances.

10. In the present circumstances, the terms "first," "second," "earlier," and "later" require some modification. I view the circumstances in this way: Liddle was the attorney for both Moritz and MPC in the *Jacobson* case (the "first" case; the "earlier" representation). He now undertakes to represent MPC in the

present case in this court, in which MPC is an adversary of Moritz (the "second" case; the "later" controversy). The pertinent contention is that during Liddle's representation of Moritz in the first case, Moritz imparted to Liddle confidences and secrets which Liddle was obliged to preserve as against his other client (MPC) in the first case and which should bar his representation of MPC in the second case.

any information which constituted a confidence or a secret as against MPC as Liddle's other client in *Jacobson*, within the meaning of Canon 4. Rather, the burden should be allocated to the doctors to come forward and to persuade that such confidences or secrets were actually imparted.

Allocating the burden in this manner, I have made a finding, above, as to what occurred in the April 7 conversation. This finding represents an acceptance of Liddle's version of that conversation. I do not lose sight of the discussion in *T.C. Theater Corp.*, referred to above, concerning the problem of showing, without revealing the contents of earlier communications, that they included confidences or secrets. But these difficulties may or may not be insuperable. The nature of the information can often be described sufficiently to permit the court to make a practical evaluation of its potential significance, but in insufficient detail to be useful to the adversary, if it is not already known to the adversary. Although Moritz enjoyed the opportunity to respond to Liddle's particularized affidavit on the content of the April 7 conversation, he did not undertake to do so. Nor did he undertake to persuade the court that there was no way in which he could adequately describe the nature of the confidences and secrets without disclosing their content too fully.

Because Moritz has failed to show that he imparted to Liddle confidences or secrets within the meaning of Canon 4, I conclude that Canon 4 and the disciplinary rules related to it do not require or support an order barring Liddle or other members of the Boardman firm from representing MPC in defense of the present lawsuit.

II. Canon 5: Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Lawyer's Independent Professional Judgment on Behalf of a Client.

The doctors also argue that the Boardman firm be disqualified because of Canon 5 of the CPR. In particular, the doctors point to DR 5–105 which provides that a lawyer:

(A) . . . shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

(B) . . . shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

A party invoking Canon 5 to disqualify his or her former counsel from continuing to appear against him or her must show: (1) the former representation; (2) a substantial relation between the subject matter of the former representation and the issues of the later lawsuit; and (3) the later adverse representation. *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 394 (S.D. Tex.1969). Although this rule was expressed in *Hutton* in terms of a challenger's "former counsel," it would logically apply as well to a circumstance in which one attorney-client relationship is formed and then continues through the time that a second, and possibly conflicting, attorney-client relationship is formed.

For reasons discussed above, I have concluded that the subject matter and issues in the *Jacobson* suit against Moritz do not bear a "substantial relation" to the subject matter and issues in the present suit brought by the doctors in this court against MPC. Therefore, the *Hutton* rule did not require Liddle to decline the employment proffered by MPC to represent it in defending the present case in this court. DR 5–105(A). So far as the respective subject matters and issues in the two cases are concerned, Liddle's exercise of independent

judgment in behalf of each client would not be, nor would it be likely to be, adversely affected by his continuing representation of the other.

However, vigorously as he might struggle to avoid it, Liddle's ability to exercise his independent professional judgment in behalf of Moritz in the *Jacobson* case is likely to be affected: (a) by the implied allegation in Moritz' complaint in the present case that Liddle would be unfaithful to Moritz' interests in the *Jacobson* case; and (b) by the fact that Moritz has moved to disqualify Liddle from representation of MPC in the present case. As Liddle has recognized since late in May, 1976, it is plain that his "multiple employment" by both MPC and Moritz in the *Jacobson* case should not continue, and that his "multiple employment" by both MPC and Moritz in the *Jacobson* case and by MPC in the present case should not continue. DR 5–105(B). If his "employment" by Moritz in the *Jacobson* case were to be discontinued, no problem would persist, of course, if he were to continue to be employed by MPC as its own attorney in the *Jacobson* case and by MPC in the present case. However, it appears that MPC and Liddle are willing that his employment by MPC in the *Jacobson* case be discontinued.

From the record in the present case, I can make no finding whether Liddle continues to be the attorney of record for Moritz in the Circuit Court for Dane County, Wisconsin, in the *Jacobson* case, but I will assume that this is true. It is for the Circuit Court for Dane County to determine whether Liddle may be permitted to withdraw as Moritz' attorney of record there. Therefore, in the order below, I will provide for the contingency that the Circuit Court will permit such withdrawal and for the contingency that it will not.

### III. Canon 9: A Lawyer Should Avoid Even the Appearance of Professional Impropriety.

Canon 9 requires lawyers "to strive to avoid not only professional impropriety but also the appearance of impropriety."

I have concluded that no professional impropriety marked any conduct of Liddle's as disclosed in this record. With respect to appearances, it may well have been a better course, in retrospect, had Liddle disclosed more promptly to Moritz that Liddle proposed to withdraw as Moritz' attorney in the *Jacobson* case and to represent MPC in the defense of the present case. But there is nothing about that oversight, if such it was, which requires or justifies disqualification of Liddle as MPC's attorney in defense of the present case.[11]

### Order

1. It is hereby ordered that plaintiffs' motion for disqualification of the Boardman firm from representation of the defendant in this case is denied upon the condition that the Boardman firm file with the clerk of this court, within 45 days, a certified copy of an order by the Circuit Court for Dane County, Wisconsin, permitting the Boardman firm to withdraw as attorney of record for Walter D. Moritz in the case of *Jacobson v. Moritz*. no. 150–236.

2. It is further ordered that in the event the condition stated in paragraph 1 is not met within 45 days, plaintiffs' motion for disqualification is granted as of the 46th day.

11. In his brief on the disqualification motion, counsel for the doctors adverts to yet another possible basis for disqualification, namely, that it may be necessary for Liddle to appear as a witness in the present case. The point is not developed in the brief. Presently I cannot perceive that Liddle's testimony will be necessary to MPC's case. Should the doctors seek to compel his testimony, it may become necessary to determine whether Liddle must withdraw as attorney for MPC.