WILLIAMSBURG WAX MUSEUM, INC., Plaintiff,

v.

HISTORIC FIGURES, INC. et al., Defendants.

NATIONAL CIVIL WAR WAX MUSEUM, INC., Plaintiff,

v.

HISTORIC FIGURES, INC. et al., Defendants.

NATIONAL SOUVENIR CENTER, INC. et al., Plaintiffs,

v.

HISTORIC FIGURES, INC. et al., Defendants.

Civ. A. 77–0093, 77–0131 and 77–1243.

United States District Court, District of Columbia.

Nov. 26, 1980.

Jerome S. Wagshal, Nelson Deckelbaum, Washington, D. C., for plaintiffs.

John S. Koch, David A. Levitt, Covington & Burling, Washington, D. C., for defendants.

MEMORANDUM

HAROLD H. GREENE, District Judge.

This is a motion to disqualify defendants' attorneys, the law firm of Covington & Burling (C & B), on the ground that they had previously served plaintiff, the National Civil War Wax Museum, Inc. (Gettysburg),[1] on the same subject matter that is involved in the pending suit.

I

This antitrust action was brought by a wax museum franchisee located in Gettysburg, Pennsylvania, against Historic Figures, Inc. (HF) (which operates a like museum in Washington, D. C.) and several others.[2] Gettysburg challenges its franchise agreement with HF's subsidiary, National Historical Museum, Inc. (NHM), asserting violations of the Sherman and Clayton Acts.[3] Defendants moved for summary judgment on September 28, 1979; plaintiff thereafter obtained one extension of time in which to file its opposition; it was denied a second extension; and it filed the instant motion to disqualify defendants' counsel shortly before its opposition to the motion was finally due (and more than two years after the commencement of this action). The parties have filed numerous memoranda, many lengthy affidavits, and hundreds of pages of exhibits concerning the motion presently before the Court.

II

The factual setting from which the motion to disqualify arises occurred approximately twenty years ago. Frank Dennis, who was president and chief operating offi-

---

1. Gettysburg is the plaintiff in Civil Action No. 77 0131. Similar motions have been filed in the other two above–entitled cases, *Williamsburg Wax Museum, Inc. (Williamsburg) v. Historic Figures, Inc., et al.*, Civil Action No. 77–0093, and *National Souvenir Center, Inc., et al. (Gatlinburg) v. Historic Figures, Inc., et al.*, Civil Action No. 77–1243. All three plaintiffs operate wax museums franchised by defendants, they are controlled by the same principals, and essentially the same claims are asserted in all three lawsuits. The decision in No. 77 0131 is also dispositive of the motions to disqualify in the other two cases.

2. The other defendants are National Historical Museum, Inc., through which HF has franchised a number of wax museums, including the one in Gettysburg; Lynch Display Corporation, manufacturer of the figures displayed in the museum; and Earl Dorfman, founder, president and principal stockholder of Lynch.

3. Also involved in the action is an exclusive sales agreement between Lynch and HF pertaining to display figures.

cer of defendants HF and NHM until his retirement in 1977, and who is an attorney by training, established a wax museum in Washington, D. C., in 1958, with the assistance of Dorfman, who manufactured the display figures and became the museum's manager. As a result of numerous inquiries concerning the purchase of figures and the establishment of other wax museums, Dennis and Dorfman decided to embark on a franchising enterprise, using NHM as the corporate vehicle. Chaim Uberman, the owner and manager of the gift shop at the Washington museum, and his partner, Arnold Wesson, were among those who sought the assistance of Dennis and Dorfman to establish another museum, and the plaintiff corporation was formed for that purpose and became the first franchisee. The founders of Gettysburg were Uberman, Wesson, Dennis, and Dorfman, and they were joined by Richard Riddell, another officer and director of HF.

Primarily at issue here is Canon 4 of the Code of Professional Responsibility which provides that an attorney "should preserve the confidences and secrets of his clients." [4] More specifically, C & B is being charged in the motion with what is generally termed a successive conflict of interest, that is, the representation by an attorney of the current adversary of a former client. The test that has most frequently been applied to determine whether an attorney should be disqualified in such a situation is whether the matter on which he represents a client now is "substantially related" to that on which he advised his former client on a previous occasion. If there is such a relationship, the attorney must be disqualified, the theory being that only by such a disqualification can the possibility be avoided that confidential information provided by the former client to the attorney might be used to that client's detriment. *T. C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113

F.Supp. 265 (S.D.N.Y.1953). Plaintiff argues that such a relationship exists here and that C & B therefore should be disqualified from further representing defendants in this litigation. The Court has concluded that, for several independent reasons, disqualification is not appropriate.

### III

■ The issue of whether there is a substantial relationship between the present litigation and the matters on which C & B previously provided advice to Gettysburg is of course essentially a factual one. If such a relationship exists in this case, the common hub would necessarily have to be the franchise agreement between Gettysburg and HF, for it is that agreement which forms the basis for the present antitrust lawsuit. On that issue, plaintiff claims that C & B advised, or must have advised, Gettysburg with respect to the agreement in 1959, when it was entered into; defendants contend that C & B did not do so. After considering the voluminous record submitted to it, the Court finds that plaintiff has failed to demonstrate [5] that C & B provided advice to Gettysburg concerning the franchise matter.

■ Before describing the evidence concerning the former relationship between C & B and Gettysburg, it is appropriate to delineate in general terms what, as a matter of law, is regarded as a "substantial relationship" within the meaning of Canon 4. Because it has adverse consequences on the judicial process [6] and, perhaps more importantly, because it has a substantial impact in time and money on a client who would have to hire new lawyers after others may already have done a significant amount of work, disqualification is not mandated when the grounds are vague or tenuous. Indeed, as the Court of Appeals

---

**4.** Canons 5 and 9 are also relied on by plaintiff and are discussed at note 19 *infra*.

**5.** The burden is on the party seeking the disqualification to demonstrate a substantial relationship. *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir. 1978).

**6.** Disqualification, especially if it occurs late in the course of litigation, is likely substantially to complicate and to delay its disposition.

for the Second Circuit [7] has held, disqualification is granted "only upon a showing that the relationship between issues in the prior and present cases is 'patently clear' ... [and] when the issues involved have been 'identical' or 'essentially the same.'" *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739–40 (2d Cir. 1978).

C & B's involvement with the parties to this action began some time in August or September, 1959, when Dennis retained the law firm to represent HF and NHM with respect to certain corporate, tax, and real estate matters which he felt to be beyond his legal expertise. Until that time, Dennis had handled all legal matters for HF and NHM with the assistance of Henry Trepagnier, a member of HF's staff and also a lawyer by training. It was also during that same general period that discussions commenced among the founders of Gettysburg regarding the proposed new museum, and Dennis suggested to the others that C & B be asked to assist in handling the initial organizational matters for Gettysburg as well as certain real estate problems relating to the site of the proposed museum. Throughout the period [8] during which C & B provided these services to Gettysburg,[9] Dennis served as the principal contact between it and C & B.

The franchise agreement between NHM, as franchisor, and Gettysburg, as franchisee, appears to have been signed on September 22, 1960. The dispute between the parties on this aspect of the motion revolves around the question whether C & B's work for Gettysburg, rather than being limited to matters of organization, incorporation, and land acquisition, also included that agreement.

Defendants turned over to plaintiff over five hundred pages of documents; plaintiff had of course access to its own books and records; it also had all the files of C & B relating to Gettysburg, including billing memoranda and time sheets;[10] and it has had access to the relevant books and records of HF and NHM. Except for the matters noted below, there is not the slightest evidence or even suggestion in all of these materials that C & B advised Gettysburg with respect to the franchise agreement.[11] In addition, Dennis stated under oath that he drew up the franchise agreement himself, together with Henry Trepagnier, without any assistance or participation from C & B.[12] Finally, the document embodying the Gettysburg franchise agreement appears to have been typed on a typewriter similar to that used to produce letters from Dennis and Trepagnier–a machine that is totally unlike the typewriters employed to produce the C & B documents submitted to the Court by plaintiff, again suggesting that C & B did not draft or otherwise originate the agreement.

■ Plaintiff's evidence in opposition to these by and large objective facts is conjectural at best. It relies on four documents which can be read to refer to a relationship between C & B and the franchise matter

---

7. Much of the law on disqualification was made in that Circuit.

8. The services were substantially completed before the end of 1961.

9. This dual relationship arose because, as noted *supra*, several of the organizers of Gettysburg were also involved with HF, although two of them were not.

10. Plaintiff relied heavily upon the absence of the time sheets of Joel Barlow, C & B partner at the time of the events, and of his desk diary. Barlow retired after the events in question and he now resides in Florida. It was maintained by C & B's attorneys, without contradiction, that he kept no time sheets. As for his desk diary, it was ultimately produced, apparently from Florida. It likewise totally fails to support plaintiff's claim that C & B performed work for Gettysburg on the franchise agreement.

11. Indeed, as best can be determined at the present time, C & B also failed to assist HF or NHM with respect to the franchise matter.

12. Similarly, John S. Koch, a partner in C & B, has sworn (1) that he and the other C & B lawyers involved in the present litigation have never performed work for Gettysburg, and (2) that his review of the C & B files and conversations with lawyers who did work for them convinced him that no relationship existed with respect to the franchise matter.

only by a considerable stretch of the imagination.[13] As for the Dennis and Koch affidavits, plaintiff has simply sought—unsuccessfully in the Court's view—to discredit the credibility of these individuals. Finally,[14] plaintiff has erected an elaborate argument of a necessary involvement of C & B in the franchise matter based on juxtapositions of dates and documents. The Court finds that argument unconvincing in the context of voluminous objective evidence to the contrary. While it is usually difficult to prove a negative, particularly after some twenty years, the Court finds that defendant has done so here.

## IV

■ Even if—contrary to the Court's conclusion—C & B had in some way participated in the franchising, either as attorney for HF or as attorney for Gettysburg, it would not help plaintiff. The conflict—of—interest rule was designed to protect a former client against the possibility that his attorney might use confidential materials in future disputes with a future adversary. But "before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir. 1977) (emphasis in original). See also, *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 479 F.Supp. 465 (E.D.La. 1979); *Moritz v. Medical Protective Co.*, 428 F.Supp. 865, 873 (W.D.Wis.1977).[15]

C & B has represented HF and its subsidiary NHM since August or September 1959. Its representation of Gettysburg grew out of the relationship with HF. Dennis was the individual with whom C & B primarily dealt on matters relating to HF and to Gettysburg. In view of these circumstances, Dennis' co—venturers in Gettysburg could not possibly have thought that information provided to C & B in connection with its work for Gettysburg would be kept confidential from HF.[16]

Indeed, if it be assumed, *arguendo*, that C & B had provided advice on the franchise agreement it would have been to its principal client HF, not to Gettysburg. Virtually

**13.** The four documents are: (1) a five-page memorandum from Dennis to Barlow describing the details of the proposed Gettysburg museum with two brief and vague references to a franchise arrangement to be worked out a "*subsequent problem*"; (2) notes made by a C & B attorney at a meeting held with the five organizers of Gettysburg which indicate details of the corporate organization and mention "K w/Historic Figures, Inc."—but any inference that a privileged discussion of the franchise agreement necessarily occurred at that meeting is negated by the detail accompanying the other items of business in the notes but glaringly absent from this item; (3) a memorandum from Riddell to a C & B attorney describing items which had been "mutually agreed upon," which includes terms of a franchise agreement—on its face, this contradicts what plaintiff attempts to prove, since it shows that the organizers negotiated the agreement among themselves; and (4) notes taken by a C & B attorney at the first directors' meeting of Gettysburg which indicate that Dennis was to "draft a draft" of the franchise agreement—again evidence supporting defendants' position that Dennis, not C & B, is responsible for the agreement.

**14.** Plaintiff also complains that defendants have not adequately responded to its various requests for the production of documents. That complaint is frivolous.

**15.** In the *Moritz* case, the court stated that in a situation where an attorney was the common counsel to two parties "there is something approaching a presumption that any information obtained by the attorney from [one or the other] might properly have been disclosed to the other ... [and] the burden should be allocated to the [challenging party] to come forward and to persuade that such confidences or secrets were actually imparted." 428 F.Supp. at 874-75.

**16.** On this aspect of the case, plaintiff argues essentially only that the *Allegaert* rule is inapplicable here because in that case, unlike this, the relationship with one client antedated that with the other by a considerable period of time and because the persons involved were extremely sophisticated. These attempted distinctions are unpersuasive. Clearly, C & B's relationship with HF preceded its contact with Gettysburg, and clearly also, the relationships between the various principals were such that it would not have required a great deal of sophistication to know that, if only because of overlapping roles of Dennis, there could have been no real expectation of confidentiality.

all its communications to the firm in its work for Gettysburg were from Dennis, president of HF, and it performed work for Gettysburg generally only at Dennis' request. In view of these relationships, it is inconceivable that C & B would also have been regarded as representing the theoretically distinct interests of Gettysburg or that Gettysburg could have believed that it was dealing with C & B on a confidential basis vis–a–vis HF. The two Gettysburg co–venturers who were not involved with HF knew that the other three co–venturers were principals in that company and they were therefore also necessarily aware that matters discussed with HF's attorneys would not be kept confidential from HF.

Courts and lawyers must be most sensitive to conflicts of interest and the misuse of the confidences of clients, and the disqualification rules therefore serve extremely important public purposes and interests. As explained by EC 4–1 of the Code of Professional Responsibility,

> Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer .... The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitate the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance.

At the same time, courts must also not be oblivious to the fact that, particularly in recent years, motions for disqualification have increasingly been used for strategic litigation advantage. *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290, 295 (6th Cir. 1979); *Allegaert v. Perot, supra,* 565 F.2d at 251; *Redd v. Shell Oil Co.*, 518 F.2d 311, 315 (10th Cir. 1975); *Ross v. Great Atlantic & Pacific Tea Co., Inc.*, 447 F.Supp. 406, 410 (S.D.N.Y.1978).

Some twenty years ago, attorneys from C & B were retained to handle various corporate matters for Gettysburg related to the stock subscription agreement, the initial corporate documents, land acquisition matters, and condemnation proceedings. A suit is now pending arising out of franchise agreements that were entered into at that time, and other C & B attorneys [17] have been retained to represent the defendants. Over two years after the original filing of the action plaintiff's response to defendants' motion for summary judgment came due, and after a motion for an extension of time to respond to the motion had been denied,[18] plaintiff sought to disqualify defendants' attorneys. Indeed, its disqualification efforts are directed not only at the one case (Gettysburg) in which there was at least some contact between defendants' counsel and the plaintiff but also at the two related cased (involving Gatlinburg and Williamsburg) in which even that tenuous relationship never existed. In the Court's judgment, no grounds exist for a disqualification on the basis advanced by plaintiff.[19]

---

**17.** It is the general, though not invariable, rule that a conflict of interest which disqualifies one member of a law firm disqualifies all. See, *e. g.*, DR 5–105(D) of the Code of Professional Responsibility.

**18.** While plaintiff claims that it had access to documents evidencing a conflict of interest only at the last minute, the participation of C & B during the 1959–60 period was revealed long before then. Many of the documents on which plaintiff relies either come from its own files or were among those produced for plaintiff's inspection and copying in July of 1977. Moreover, in an answer to an interrogatory, filed in August, 1977, and sworn to by Uberman, plain-

tiff had indicated that C & B had performed some work for the company.

**19.** There is likewise no merit to several other contentions advanced by plaintiff. First, C & B is not disqualified under DR 5-102 of the Code of Professional Responsibility, as plaintiff suggests, because one or more of the members of the law firm may be called as witnesses. A party cannot disqualify its opponent's attorneys simply by threatening to call them as witnesses to advice they may have given with respect to documents they prepared or reviewed. Beyond that, plaintiff asserts no specific facts which would persuade the Court that the testimony of C & B attorneys will be neces-

For the reasons stated, it is this 25th day of November, 1980,

ORDERED That plaintiff's motion for disqualification of defense counsel be and it is hereby denied; and it is further

ORDERED That plaintiff shall file its response to defendants' motion for summary judgment in the above-entitled cases within twenty days from the date of the entry of this order.

sary at all, much less that their testimony would or may be prejudicial to defendants, DR 5 102(B). Second, plaintiff's assertion that C & B should be disqualified now under DR 5–105 for its alleged failure, twenty years ago, to inform Gettysburg of its dual representation must fall with the Court's finding that C & B did not represent Gettysburg with respect to the franchise matter. See *Moritz v. Medical Protective Co., supra*, 428 F.Supp. at 875. Finally, plaintiff argues that Canon 9, which provides that "a lawyer should avoid even the appearance of professional impropriety," mandates disqualification of C & B in this case. It is the view of this Court that no appearance of professional impropriety arises from C & B's representation of defendants in this case, re-

gardless of its general corporate work for plaintiff long ago. Moreover, plaintiff cannot circumvent its burden of showing a *substantial* relationship between the work C & B performed for Gettysburg and the present litigation by protesting "appearances" where, as here, significant hardship to defendants would result from disqualifying their long–standing legal advisers and their representatives in this litigation.