# Disqualification of Prosecutor
# Because of Former Representation

In matters that are substantially related to an Assistant United States Attorney's representation of clients prior to joining the government, the attorney should not participate in any investigation or prosecution that foreseeably involves individuals or entities who, although they arguably had not been the attorney's "clients," were contacted by the attorney in the course of his prior representation and indirectly paid the attorney's legal fees, unless the attorney's participation is essential to the conduct of the Department's law enforcement operation.

Under the Supremacy Clause of the Constitution, a state court or bar association may regulate the conduct of federal attorneys acting in the scope of their federal authority only to the extent that such regulation is not inconsistent with the exigencies of federal employment.

January 11, 1985

MEMORANDUM OPINION FOR THE DIRECTOR,
EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS

We have been asked to provide advice for a Special Assistant United States Attorney (the AUSA) concerning his potential prosecution of suspected pornographers who indirectly paid his legal fees while he was engaged in the private practice of law. We understand that the pertinent facts are as follows.

When in private practice, the AUSA represented an unspecified number of individuals charged with displaying or selling obscene materials, to whom we shall refer collectively in this memorandum as XYZ. He was aware at the time that XYZ had obtained the sexually explicit materials for which they were prosecuted from Corporation A, controlled by a Mr. B. The AUSA was also aware that XYZ received reimbursement for legal fees from A and B, although the fees were paid to the AUSA's firm by XYZ. In addition, during this period, the AUSA acknowledged that he communicated with a subsidiary corporation, C, wholly owned by either A or B, regarding the status of certain of these cases. C provided financial support to the individual clients by giving them credit on purchases from C in amounts directly proportionate to the AUSA's legal fees.

The AUSA's position was created by the Immigration and Naturalization Service to prosecute multi-state conspiracies involving alien smuggling activity. In this capacity, the AUSA has reviewed FBI reports on A and B that contain facts that the AUSA believes "far exceed any knowledge" he may have had of A and B's activities when he was active in the defense of obscenity cases. He anticipates that A and B will be the targets of further FBI investigation and possible prosecution by the Department of Justice.

1

Based on these facts, the AUSA, a member of the Arizona Bar,[1] has inquired whether he should disqualify himself from participating in the counseling of FBI agents in their pursuit of covert criminal investigations that may involve A and B. He has also inquired whether ethical considerations would preclude him from prosecuting a conspiracy case involving A and B.

The starting point for an analysis of attorney disqualification would ordinarily be the Model Code of Professional Responsibility of the American Bar Association (Model Code). The Model Code has been expressly adopted by the Supreme Court of Arizona, with certain amendments. 17A Ariz. Rev. Stat. Ann., S. Ct. Rule 29(a) (1983). The Department of Justice has consistently maintained, however, that rules promulgated by state bar associations that are inconsistent with the requirements or exigencies of federal service may offend the Supremacy Clause of the Constitution.[2] This position is supported by the case of *Sperry* v. *Florida*, 373 U.S. 379 (1963), in which the Supreme Court held that when Congress and the Executive had authorized nonlawyers to practice before the United States Patent Office, the State of Florida could not prohibit such conduct as the unauthorized practice of law. Similarly, this Office has concluded that a Department attorney, acting under Departmental orders in an undercover operation, cannot be guilty of violating state ethical rules "if his acts are authorized by federal law, including the Department's regulations prescribing ethical standards," just as a federal employee, under appropriate circumstances, may perform authorized federal functions without regard to the limits of state criminal law. *See* Memorandum for Thomas P. Sullivan, United States Attorney, Northern District of Illinois, from Mary C. Lawton, Deputy Assistant Attorney General, Office of Legal Counsel 14 (Aug. 1, 1978) (citing *In re Neagle*, 135 U.S. 1, 75 (1890)).

We analyze below the Model Code and its treatment by the courts of various jurisdictions. When possible, we have relied primarily on decisions of federal courts, but have found it necessary to include some decisions of state courts as well. We do not assume that any of these decisions are binding on the federal officials who will ultimately make the decision about the AUSA's participation in this case, unless mandates of the United States Constitution are involved. Rather, the principles are explained in order to assist you in formulating the managerial judgment that will determine the resolution of the issue. In addition to the Model Code, we have sought general guidance from the American Bar Association's new Model Rules of Professional Conduct, which replaced the old Model Code in August 1983, but which have not yet been adopted by most states. We discuss, first, the attorney's duty of confidentiality to former clients and its

[1] The AUSA is also a member of the Illinois Bar. Because our conclusions are based on general principles, we do not anticipate that any different result would obtain under Illinois law. Illinois has adopted the ABA Model Code with no relevant amendments. *See* 110A Ill. Ann. Stat. foll. ¶ 772 (Smith Hurd Supp. 1983).

[2] The Supremacy Clause provides that the "Constitution, and Laws of the United States which shall be made in Pursuance thereof . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

application to the present circumstances. In Part II, we address other considerations that may bear upon your decision regarding the disqualification. Finally, we address the application of the general principles to Department of Justice officials.

For the reasons discussed below, we conclude that the AUSA's participation in these obscenity prosecutions probably would not violate the mandatory Disciplinary Rules of the Model Code so as to justify disciplinary action by the Arizona Bar against him. Nevertheless, we conclude that the attorney's duty to preserve client confidentiality under the Model Code could reasonably be applied to information that the AUSA received about A and B in the course of his prior representation. In addition, we believe the Ethical Considerations of the Model Code, including the requirement that attorneys avoid even the appearance of professional impropriety, as well as the constitutional protections afforded a criminal defendant, might lead a court to bar the AUSA's involvement in the prosecution of individuals whose interests are so closely intertwined with the subject of his former professional activities. The ethical obligations of attorneys are only heightened in the case of a public prosecutor. We therefore recommend for prudential reasons that the AUSA not participate in any investigations or prosecutions foreseeably involving Corporation A, Mr. B, or Subsidiary C that relate to his prior representation, assuming that his participation is not considered essential to the conduct of the Department's law enforcement operation, even though his disqualification may not be clearly compelled by the prevailing ethics rules.

## I. Duty of Confidentiality

The general principles are simply stated. First, a lawyer has a duty to protect confidential information of "one who has employed or sought to employ him." Model Code EC 4–1 (1979). Canon 4 of the Model Code provides that "a lawyer should preserve the confidences and secrets of a client," and therefore a lawyer may not use such confidences to the disadvantage of the client. Model Code DR 4–101(B)(2). This duty outlasts the lawyer's employment, terminating only upon consent of the client. Model Code EC 4–6. The current Model Code contains no procedural disqualification provision for one whose subsequent employment might require disclosure of client confidences.[3] Refusal of such employment is suggested in EC 4–5 as an aspirational standard only.

Nevertheless, courts have held that Canon 4 implicitly requires disqualification if divulgence of client confidences could occur.[4] In order to encourage clients freely to discuss confidential problems with their attorneys, courts have

---

[3] Canon 5, which provides that "a lawyer should exercise independent professional judgment on behalf of a client," does contain a disqualification provision. DR 5–105(A) requires a lawyer to decline proffered employment if the exercise of his independent professional judgment is likely to be adversely affected by a conflict of interest. The purpose of this provision is primarily to protect the lawyer from competing client interests, rather than to protect the confidentiality of client information. American Bar Foundation, *Annotated Code of Professional Responsibility* 228 (1979). Although the provision is arguably relevant here, its principal application is in simultaneous multiple client representation. *Id.*

[4] This determination is based, in part, on EC 4–5, which states that "no employment should be accepted that might require such disclosure [of client confidences]."

3

imposed a strict prophylactic rule which bars an attorney from representing an interest directly adverse to that of a former client. *Cord* v. *Smith*, 338 F.2d 516, 524–25 (9th Cir. 1964); *Bicas* v. *Superior Court*, 567 P.2d 1198, 1201 (Ariz. Ct. App. 1977). Imposing such a disability upon the attorney is designed to protect the former client from even the possibility of disclosure and wrongful use of information conveyed in confidence. *Meyerhofer* v. *Empire Fire & Marine Ins. Co.*, 497 F.2d 1190, 1196 (2d Cir.), *cert. denied*, 419 U.S. 998 (1974); *see also* Annotation, 52 A.L.R.2d 1243, 1250 § 4 (1957). In the case of public prosecutors, the obligations arising out of Canon 4 of the Model Code may be compounded by constitutional considerations. A prosecutor whose former dealings with the defendant have made him privy to facts related to the prosecution may be barred from the case in order to preserve a fair and impartial trial as guaranteed by the Due Process Clause of the Fifth or Fourteenth Amendment. *Gajewski* v. *United States*, 321 F.2d 261, 267 (8th Cir. 1963); *Young* v. *State*, 177 So. 2d 345, 347 (Fla. Dist. Ct. App. 1965); *People* v. *Rhymer*, 336 N.E.2d 203, 204 (Ill. App. Ct. 1975). The special status of a prosecutor is recognized in the Model Code: the prosecutor has an obligation not merely to convict but to seek justice. Model Code EC 7–13. Accordingly, the courts have developed a rule for the disqualification of prosecutors, which has frequently been stated as follows: "an attorney cannot be permitted to participate in the prosecution of a criminal case if, by reason of his professional relations with the accused, he has acquired knowledge of facts upon which the prosecution is predicated or which are closely interwoven therewith." *Young* v. *State*, 177 So. 2d 345, 346 (Fla. Dist. Ct. App. 1965); *People* v. *Gerold*, 107 N.E. 165, 177 (Ill. 1914); *State* v. *Leigh*, 289 P.2d 774, 777 (Kan. 1955); *see* Annotation, 31 A.L.R.3d 953, 957–58 (1970).

This disqualification rule rests on a generally irrebuttable presumption that in the course of an attorney-client relationship, confidences were disclosed to the attorney by the client. A court will not inquire whether disclosures were in fact made or whether the attorney is likely to use confidences to the detriment of his former client. *See, e.g., NCK Org. Ltd.* v. *Bregman*, 542 F.2d 128, 134 (2d Cir. 1976); *Richardson* v. *Hamilton Int'l Corp.*, 469 F.2d 1382, 1384–85 (3d Cir. 1972), *cert. denied*, 411 U.S. 986 (1973). The court's inquiry is limited solely to whether the matters of the present proceeding are "substantially related" to matters of the prior representation. *T.C. Theater Corp.* v. *Warner Bros. Pictures*, 113 F. Supp. 265, 268–69 (S.D.N.Y. 1953).

The courts have generally applied the disqualification rule and the presumption rigorously. For example, in the leading case of *Emle Industries, Inc.* v. *Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973), Judge Kaufman, writing for the court, held that a plaintiff's counsel in patent litigation, who had previously represented the part-owner of the defendant corporation involving an issue identical to that in the present proceedings, would be disqualified from asserting the related claim against his former client. Interpreting Canon 4, the court adopted the rule that "[w]here it can reasonably be said that in the course of former representation an attorney *might* have acquired information related to

4

the subject matter of his subsequent representation, the attorney should be disqualified." *Id.* at 571. The courts will not require the former client to demonstrate that his attorney actually possessed confidential information in addition to having access to it, for even if such proof were available, the former client might not be able to use it for fear of disclosing the very confidences he wishes to protect. *See* Note, *Attorney's Conflict of Interests: Representation of Interest Adverse to that of Former Client*, 55 B.U. L. Rev. 61, 76 (1975); *Alpha Inv. Co.* v. *City of Tacoma*, 536 P.2d 674, 676 (Wash. Ct. App. 1975).

The courts will not presume irrebuttably that an attorney has acquired confidential information when the person seeking disqualification was not actually the attorney's client, but was the codefendant of a former client in the prior proceeding. The mere possibility that in preparing a cooperative defense the attorney may have received confidences of the codefendant is insufficient to establish grounds for disqualification. Under these circumstances, the court will disqualify the attorney only if it finds that the attorney was actually privy to confidential information of the former codefendant. *Wilson P. Abraham Constr. Corp.* v. *Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977); *Fred Weber, Inc.* v. *Shell Oil Co.*, 432 F. Supp. 694, 697 (E.D. Mo. 1977). The presumption has also been found to be rebuttable in other situations in which the person urging disqualification was not himself an actual client of the attorney. For example, a prosecuting attorney was entitled to rebut the inference that as a result of his former representation of the defendant's father-in-law in a separate matter, he had acquired confidences or secrets related to the defendant's case. *United States* v. *Newman*, 534 F. Supp. 1113, 1125–26 (S.D.N.Y. 1982). These principles define the inquiry that will determine whether and to what extent the AUSA owes a duty to protect confidences he may have acquired from A and B in the course of his former representation. First, we must consider whether A and B were "clients" of the AUSA and can thus claim the benefit of the irrebuttable presumption that he possesses confidences of theirs. Second, if A and B were not "clients" in the traditional sense of the word, we will examine whether they are nevertheless entitled to be protected by a continued obligation of confidentiality arising out of Canon 4. Finally, we must determine whether there is a "substantial relation" between the former obscenity representation and the prospective prosecution of A and B.

*A. Client Status of A and B*

The Model Code does not define the term "client." This omission poses problems in applying the Model Code's provisions to the undefined relationship that the AUSA maintained with Corporation A, Mr. B and Subsidiary C, who financed and participated in the AUSA's representation of criminal defendants. "The canons and disciplinary rules do not address themselves frankly and explicitly to this special set of relationships, and there is awkwardness in attempts to apply the canons and rules." *Moritz* v. *Medical Protective Co.*, 428 F. Supp. 865, 872 (W.D. Wis. 1977) (referring to interrelationships among insurer, insured, and attorney).

5

This awkwardness can be alleviated somewhat by resort to analogies. Like the attorney who represents both an insured and an insurer, the AUSA had direct obligations to his clients XYZ, while maintaining some concomitant relationship with the financiers A and B. One court, acknowledging that such a situation is *sui generis*, held that the insurer, which chooses the attorney for the insured, is the "client" of the attorney and the attorney must observe Canon 4 obligations to both the insurer and the insured. *Id.* Thus, when an insurance policy imposes on the insurer the duty to defend a claim against the insured and entitles the insurer both to select the lawyer who will represent the insured and to supervise the defense, then that insurer enjoys an attorney-client relationship with the attorney it selects. *Id.* This determination is supported by the "community of interest" that exists between the insurer and the insured. ABA Comm. on Professional Ethics, Formal Op. No. 282 (May 27, 1950). That interest is largely financial. *Moritz*, 428 F. Supp. at 872.

An application of this analogy to the AUSA's case would require further facts than those provided to us. It would be germane, for example, whether A and B had a formal agreement to pay the legal fees of XYZ; whether A and B had the right to choose and supervise the attorney for the defense of XYZ; and whether A and B also had agreed to pay fines or penalties imposed on XYZ, so as to establish a community of financial interest. Without this information, we can only identify the possibility that A and B could be considered "clients" of the AUSA by resort to insurance case law.

Another possible analogy is the relation between a parent corporation and the attorney for a subsidiary corporation. Some authorities indicate that in such a situation, the parent can be considered a client of the attorney. In one case, the court held that the evidentiary attorney-client privilege, notwithstanding the general rule that the privilege is waived if an outsider is made privy to attorney-client information, was preserved when an officer of the parent company participated in confidential discussions between the subsidiary and its attorney. In this context, a third person who was informed in order to further the interest of the principal client, and to whom disclosure was "reasonably necessary" to further the purpose of the legal consultation, was found a "client" to the extent of preserving the privilege. *Insurance Co. of N. Am.* v. *Superior Court*, 166 Cal. Rptr. 880 (Ct. App. 1980). In order to apply this analogy conclusively, we would again need further facts upon which to base our judgment. For example, it would be significant whether the communications between A and B and the AUSA were made to further the defense of XYZ, whether they included any confidences or secrets of XYZ,[5] and whether XYZ consented to such disclosures.[6]

---

[5] The Code defines "confidences" as "information protected by the attorney-client privilege under applicable laws," and "secrets" as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Model Code DR 4–101. The ethical obligations of an attorney consequently encompass not only privileged information but also other information.

[6] If the communications had included confidences or secrets, and no consent had been given by XYZ, then either A or B would have been included in the client relationship, or the AUSA might have breached his obligation to protect the confidences of XYZ under DR 4–101(B).

Even without identifying a third-party payor as a "client," the Supreme Court has recognized the danger of divided allegiance that may result from third-party payment of legal fees, especially in a criminal case. In *Wood* v. *Georgia*, 450 U.S. 261 (1981), the Court found an impermissible conflict of interest in an attorney's representation of two employees of an "adult" movie theater charged with distributing obscene materials. The conflict arose because, under an employment agreement, the owner of the theater undertook to furnish several forms of assistance to the employees if they should face legal trouble as a result of their employment, including payment of legal fees, fines, and bonds. *Id.* at 266. Recognizing a significant risk that a lawyer in this situation will be reluctant to encourage his client to offer testimony against the employer or otherwise to take action detrimental to the employer in marshaling a defense, the Court concluded that the employees had been deprived of due process rights. *Id.* at 269. Although the Court did not explicitly find that the employer was itself a "client" of the lawyer, the Court stated that the lawyer was the "agent" of the employer, and thus subject to a possible conflict of interest. *Id.* at 267; *see also In re Abrams*, 266 A.2d 275, 278 (N.J. 1970) (it is "inherently wrong for an attorney who represents only the employee to accept a promise to pay from one whose criminal liability may turn on the employee's testimony"). Thus, the courts have recognized that in the criminal setting, the loyalty incident to a fee arrangement can be significant, although these cases do not resolve whether the loyalty gives rise to a duty of confidentiality to the third-party payor.[7]

Although these examples do not resolve the AUSA's issue directly, they illustrate the possibility that persons not immediately identifiable as "clients" may still be placed in a position to share some of the attributes of an attorney-client relationship. Some authorities, in contrast, have determined that the payment of legal fees by a third person, in and of itself, does not create an attorney-client relationship between the attorney and his client's benefactor sufficient to sustain a claim of privilege for communications between them. *Priest* v. *Hennessy*, 409 N.E.2d 983, 987 (1980) (third party merely paid legal fees; court refused privilege to fact of fee arrangement); *see ABA/BNA Lawyer's Manual on Professional Conduct* 80–4301 (1984) (submission of Maryland State Bar Association Committee on Ethics). Thus, the third-party payment of legal fees without further participation in the defense may be insufficient to establish a basis for the strict evidentiary attorney-client privilege or the more fluid Canon 4 relationship.

The determination whether A and B were, in fact, "clients" of the AUSA would entail the application of facts beyond the information provided to us. However, we do not believe such a determination is necessary to reach our conclusion here. The Model Code and the case law have given an expansive

---

[7] The Model Code discourages third-party fee arrangements. It permits such an arrangement only with consent of the client after full disclosure, and charges the attorney with the responsibility to ensure that his independent judgment is not impaired thereby. Model Code DR 5–107, EC 5–23. The Model Code does not make clear, however, what obligations, if any, the lawyer may have to those who pay his fees.

interpretation to the attorney-client relationship in the context of Canon 4, as discussed below. In our view, they provide a sufficient basis for encompassing A and B within the scope of the AUSA's obligations of confidentiality, irrespective of a formal attorney-client relationship.

## B. Alternative Basis for Obligation of Confidentiality

The Model Code states clearly that the obligation of a lawyer to protect confidences is broader than the scope of the evidentiary attorney-client privilege. Model Code EC 4–4.[8] Not only does it protect a client's "secrets" as well as "confidences," *see supra* note 5, but it also is owed by the attorney to "one who has employed or sought to employ him." Model Code EC 4–1. The Model Code does not explain why this phrase was chosen rather than the term "client." It is not clear whether the phrase "one who has employed or sought to employ him" was intended to include one who pays the legal fees of a client, but the effect of the phrase is to broaden the class of individuals to be protected by the policy of encouraging frank communications for preparation of an attorney's case.

Interpreting the attorney's Canon 4 duties, courts have frequently applied the Canon broadly in an effort to protect the confidences of those who might not qualify as "clients" in the strict sense of the term: "The sole requirement under Canon 4 is that the attorney receive the communication in his professional capacity." *Doe* v. *A Corp.*, 330 F. Supp. 1352, 1356 (S.D.N.Y. 1971), *aff'd*, 453 F.2d 1375 (2d Cir. 1972). In addition, there is authority for the proposition that a "fiduciary obligation or an implied professional relation" may exist in the absence of a formal attorney-client relationship. *Westinghouse Elec. Corp.* v. *Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978). Thus, "'[i]t is clear that where an attorney receives confidential information from a person who, under the circumstances, has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidence irrespective of the absence of a formal attorney-client relationship.'" *United States* v. *Newman*, 534 F. Supp. 1113, 1125 (S.D.N.Y. 1982) (quoting *Nicholas* v. *Village Voice, Inc.*, 417 N.Y.S.2d 415, 418 (Sup. Ct. 1979)).

In one case, the Florida District Court of Appeal found that Canon 4 precluded a prosecutor, who had been a member of a public defender's office that represented the defendant, from participating in the prosecution of the case if he had ever interviewed the defendant in his former capacity. The court thus did not invoke the irrebuttable presumption that confidences were conveyed to the attorney — a presumption accorded only to former "clients" of an attorney — but instead permitted the defendant to establish that he had, in fact, conveyed confidences. Without seeking to identify an "attorney-client" relationship between the prosecutor and the accused, the court considered whether the prosecutor's former "professional relations" and "dealings" with the accused

---

[8] The Model Rules of Professional Conduct explain that "[t]he confidentiality rule applies not merely to matters communicated in confidence by the client but also *to all information relating to the representation.*" Rule 1.6 comment, 52 U.S.L.W. 6 (Aug. 16, 1983) (emphasis added).

were sufficient to deprive the accused of a fair trial. *Young* v. *State*, 177 So. 2d 345, 346 (Fla. Dist. Ct. App. 1965).

The Nebraska Supreme Court disqualified a prosecutor who had had a "loose office arrangement and association" with one of the defendant's lawyers, even though the partnership had been practically dissolved, each partner practiced separately, they did not share fees, and no conversation regarding the defendant had taken place between them. Again, the court did not attempt to establish the existence or non-existence of an attorney-client relationship between the prosecutor and the accused. Rather, it focused on the possibility that the accused was denied the impartiality to which he was entitled. Such a division of forces in a law office "would be altogether out of harmony with the age-old ethics of the profession." *Fitzsimmons* v. *State*, 218 N.W. 83, 84 (Neb. 1928).

A prosecuting attorney who represented himself over the telephone to the defendant as defense counsel and induced her to impart confidential information prejudicial to her defense came "within the spirit if not the letter" of the rule against prosecuting a former client, and was consequently disqualified. The court noted that had the attorney acquired the same information in the role of an actual defense attorney he would have been barred from prosecuting the defendant. Thus, although there was no actual attorney-client relationship, Canon 4 was invoked. *State* v. *Russell*, 53 N.W. 441, 444 (Wis. 1892). Similarly, a prosecuting attorney who, before becoming prosecutor, had met with the defendant and quoted a price for representing him should have been disqualified from the case on Canon 4 grounds, even though he never actually represented the defendant. *Satterwhite* v. *State*, 359 So. 2d 816, 818 (Ala. Crim. App. 1977). If an attorney has discussed a defendant's case with him, the attorney is thereby disqualified even if there is no contract of employment or attorney-client relationship. *Id.*

As discussed above, a criminal defendant who established that the prosecuting attorney had represented his codefendant in a prior case was entitled to disqualify the prosecutor if he could show that the prosecutor had obtained the defendant's confidences as a result of the prior representation. *Wilson P. Abraham Constr. Corp.* v. *Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977). The obligations of Canon 4 have therefore been extended even to one in a collateral position with respect to the attorney and his principal client. In each of these cases, despite the absence of an attorney-client relationship, the attorney was barred from representing an interest that would risk disclosure of information confided in the attorney by a person whom the court found to fall within the ambit of the non-disclosure policy.

The rule is perhaps better illustrated by the cases in which the relation between the attorney and the defendant was held to be too attenuated to require automatic disqualification from the subsequent matter. From those decisions a common principle emerges: when the attorney-client relationship is not direct, the attorney will be permitted to prosecute the case only if he could not possibly have gained confidential information regarding it. *See, e.g., Gajewski* v. *United States*, 321 F.2d 261, 268 (8th Cir. 1963) (no disqualification from criminal

prosecution on account of prior civil representation because misuse of confidential information inconceivable); *Dunn* v. *State*, 264 So. 2d 823, 825 (Miss. 1972) (no disqualification on account of prior discussion with defendant regarding possible representation, because facts of case never discussed); *Autry* v. *State*, 430 S.W.2d 808, 810 (Tenn. Crim. App. 1967) (same; no confidential communication passed between attorney and accused); *State* v. *Henry*, 9 So. 2d 215, 217 (La. 1942) (no disqualification on account of discussion with defendant's relatives; trial court found attorney had "no information of any kind from the defendant or anyone else" regarding case). These opinions appear to recognize that the evil to be avoided by a decision to disqualify is the potential misuse of confidential information, or the appearance thereof. If the court is satisfied that no such information was acquired, disqualification will not be ordered.

In light of these elaborations upon the ethical duties of an attorney, we conclude, first, that any communications that took place between A and B and the AUSA would appear to fall within the general policy of Canon 4. "A communication must be regarded as confidential where it possibly is so, although it is not entirely clear that the relations exist." H. Drinker, *Legal Ethics* 134 (1980). Information imparted to an attorney by his client's benefactor for the purpose of assisting in the client's defense is part of the overall attorney-client channel of communication that Canon 4 is designed to foster. Because "the issue is . . . whether there exist sufficient aspects of an attorney-client relationship for purposes of triggering inquiry into the potential conflict," *Glueck* v. *Jonathan Logan, Inc.*, 653 F.2d 746, 748–49 (2d Cir. 1981), we believe that the precise circumstances under which A and B communicated to the AUSA are a critical element of the inquiry. Even if the communications between the AUSA and A and B could not be shielded in a court proceeding by the privilege reserved for only a limited class of attorney-client conversations, if these communications were reposed in an attorney acting in his professional capacity in the defense of a client, then they should be protected. Second, if confidences were conveyed to the AUSA, he could not claim the benefit of the case law in which the courts found that it was impossible for the attorney to have acquired confidential information under the circumstances.

Canon 4 analysis is unaffected by the possibility that all the information the AUSA acquired about A and B may already be known independently by other investigative and prosecutive officials. The Model Code itself emphasizes that the ethical obligation of a lawyer to guard confidences and secrets, "unlike the evidentiary privilege, exists without regard to the nature or source of information *or the fact that others share the knowledge*." Model Code EC 4–4 (emphasis added). The ethical precept is not nullified even if all confidential information to which a lawyer had access is independently known to others from any source. *NCK Org. Ltd.* v. *Bregman*, 542 F.2d 128, 133 (2d Cir. 1976). On balance, therefore, we believe the better course is for the AUSA to observe the obligations of Canon 4 with respect to any confidences and secrets of A and B that he acquired in his role as defense attorney.

10

## C. Substantial Relation Between Former and Subsequent Matters

The third aspect of a disqualification analysis seeks to ascertain whether the matter of former representation is "'substantially related' to the issues likely to arise during the course of the litigation." *Redd* v. *Shell Oil Co.*, 518 F.2d 311, 315 (10th Cir. 1975). In the present case, we must determine whether the representation of XYZ and the involvement of A and B in the obscenity cases are so closely connected with the prospective prosecution of A and B on charges of conspiracy to commit obscenity-related offenses that confidences might be jeopardized. *See Richardson* v. *Hamilton Int'l Corp.*, 469 F.2d 1382, 1385 (3d Cir. 1972), *cert. denied*, 411 U.S. 986 (1973). The requisite substantiality is present if the factual contexts of the two matters are similar and if there is reasonable probability that confidences were disclosed which could be used against the client. *Trone* v. *Smith*, 621 F.2d 994, 998 (9th Cir. 1980).

The courts have employed the "substantial relation" test as a further means to ensure the protection of client confidences. *Duncan* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981); *American Roller Co.* v. *Budinger*, 513 F.2d 982, 984 (3d Cir. 1975). The overlap of subject matters, issues, and other facts between the two representations must be delineated with specificity to allow for the careful comparison that the rule requires. *Duncan*, 646 F.2d at 1029. It is clear that the inquiry is meticulously factual; "merely pointing to a superficial resemblance" is insufficient. *Id.*

Applying that principle to the AUSA's situation, we believe there may well exist a substantial relation between the information acquired in the course of representing XYZ on obscenity charges and a conspiracy prosecution of A and B for obscenity-related activities. However, we do not have sufficient facts about the two prosecutions to draw the fine lines required by the cases. The determination whether there is a substantial relation must be made with a full knowledge of the two matters, and the knowledge we have acquired is limited. Although the prospective prosecutions of A and B are presumably distinct from those of XYZ, it appears that the overall business operation which is the target of investigation involves facts common to the two. The AUSA has stated that the information he reviewed in FBI files regarding A and B "far exceeds" any knowledge he may have acquired from his representation of XYZ, not that it is unrelated or qualitatively different. The sexually explicit materials that clients XYZ were charged with displaying were supplied by A and B, so that facts relating to the publications themselves would likely overlap. In addition, the basic legal obscenity issues are likely to be very similar.[9] Moreover, the scope of the proposed investigation as described is evidently quite broad. At least in theory, it is possible that the investigation could eventually lead to involvement of the AUSA's "conspiracy" objective, and we believe the possibility that clients XYZ could be implicated in such a conspiracy sharpens the substantial relation between the matters. Of course, if XYZ were implicated, everything

[9] Even if the prosecutions of XYZ were brought under state law and the proposed conspiracy charges will be based on federal law, there would undoubtedly be a significant similarity of legal issues.

11

we have discussed regarding the AUSA's duties to A and B would apply *a fortiori* to XYZ, with whom he maintained a formal attorney-client relationship. We believe, therefore, that very careful consideration must be given to whether a court would find a substantial relation between the former representation of XYZ (with assistance from A and B) and the current investigation or prosecution of A and B.

We reiterate the general rule: "an attorney cannot be permitted to participate in the prosecution of a criminal case if, by reason of his professional relations with the accused, he has acquired knowledge of facts upon which the prosecution is predicated or which are closely interwoven therewith." Although we are not in possession of enough facts to apply these words conclusively to the present situation, we believe that a court would likely find that "by reason of his professional relations," the AUSA has acquired knowledge of facts "which are closely interwoven" with the prospective prosecution. If such a finding could be made on these facts, no more concrete predicate would be required to indicate the need for disqualification of a criminal prosecutor.

## III. Other Considerations

### A. *Appearance of Impropriety*

Canon 9 of the Code imposes upon attorneys an obligation to avoid even the appearance of professional impropriety. Model Code DR 9–101; EC 9–6. One commentator has gone so far as to urge that this canon be used to disqualify attorneys even when the connection between former and subsequent representations is not great enough to satisfy the substantial relation test of Canon 4. *See* Note, *Ethical Considerations When an Attorney Opposes a Former Client: The Need for a Realistic Application of Canon Nine*, 52 Chi.-Kent L. Rev. 525, 535–37 (1975).

In *Rodriguez* v. *State*, 628 P.2d 950, 957 (Ariz. 1981), the Arizona Supreme Court took this approach and held that a public defender did not violate the Disciplinary Rule when he failed to withdraw from representation of a defendant whose defense could have implicated a former client of the office. Canon 9 required disqualification of the attorney, however, because there was an unavoidable appearance that confidential information gained from the former client could be used to his disadvantage. Some courts have declined to adopt this "blanket approach" to Canon 9. *See, e.g.*, *Silver Chrysler Plymouth, Inc.* v. *Chrysler Motors Corp.*, 518 F.2d 751, 757 (2d Cir. 1975) (Canon 9 "not intended completely to override the delicate balance created by Canon 4"); *Board of Educ.* v. *Nyquist*, 590 F.2d 1241, 1247 (2d Cir. 1979) ("[W]hen there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases."). More often, courts will decide a disqualification issue on the basis of Canons 4 and 9 in combination, and Canon 9 generally serves to resolve any doubts in favor of disqualification. *See* Model Code EC 9–2.

12

## B. Possible Effects of Failure to Disqualify

The possible adverse consequences of participation in this matter are varied. First, the AUSA could be found to have violated the Disciplinary Rule prohibiting disclosure of client confidences. In our opinion, however, his involvement would not fall strictly within the letter of the Disciplinary Rules so as to warrant a finding of violation. The ambiguity of A and B's "client" status, while not automatically obviating the necessity for disqualification, would lessen the likelihood that a court would impose disciplinary sanctions in this unique situation without some showing of intentional wrongdoing. *Cf. In re Ruffalo*, 390 U.S. 544, 550 (1968) (lawyer facing penalty of disbarment is entitled to due process protections). To justify discipline against an attorney, a court must be satisfied by clear and convincing evidence that the attorney has violated one or more of the Disciplinary Rules. *In re Mercer*, 652 P.2d 130, 133 (Ariz. 1982). Because transgression of a prophylactic rule does not necessarily connote any actual wrongdoing, and because there is no clear requirement of withdrawal under these circumstances in the Disciplinary Rules themselves, we believe a court would not find intentional misconduct sufficient to justify professional censure.

Professional discipline is not the only possible consequence of an erroneous decision to participate in the case, however. Even if conduct were insufficient to support an ethical violation, it could still require the attorney's disqualification from a particular matter. The vast majority of criminal cases in which disqualification was required have not resulted in disciplinary action against the attorney. Rather, courts have granted reversals of convictions on the ground that the defendant was denied a fair trial. *See, e.g., State v. Leigh*, 289 P.2d 774, 777 (Kan. 1955) (reversal although no claim of intentional misconduct by the attorney); *People v. Rhymer*, 336 N.E.2d 203, 205 (Ill. Ct. App. 1975) (same). A federal court dismissed an indictment because the prosecutor who presented the case to the grand jury had had impermissible professional dealings with the accused. *United States v. Catalanotto*, 468 F. Supp. 503, 507 (D. Ariz. 1978). Although there is a paucity of federal cases involving the issue of disqualification of a prosecuting attorney on these grounds, in analogous state cases the prosecutor's relation to the accused has been the basis for post-conviction relief, *see Young v. State*, 177 So. 2d 345, 348 (Fla. Dist. Ct. App. 1965), a new trial, *see State v. Halstead*, 35 N.W. 457, 459 (Iowa 1887), recusal orders, *see Love v. Superior Court*, 168 Cal. Rptr. 577, 581 (Ct. App. 1980) (recusal order for discrete six-person section of district attorney's office "tainted" by former representation), and mistrials, *see Burkett v. State*, 206 S.E.2d 848, 851 (Ga. 1974) (reversible error for trial court merely to disqualify prosecutor without granting mistrial). In sum, the prosecuting attorney who approaches the ethical standards too lightly risks not only professional censure but also the loss or postponement of a conviction.

## C. Vicarious Disqualification

Under the Model Code, "if a lawyer is required to decline employment or withdraw from employment *under a Disciplinary Rule*, no partner, or associ-

13

ate, or any other lawyer affiliated with him or his firm, may accept or continue such employment." Model Code DR 5–105(D) (emphasis added).[10] This imposition of a disability upon the entire "firm" — a term not defined in the Model Code[11] — is referred to as "vicarious disqualification" or "imputed knowledge." Its rationale is, once again, the possibility that confidential information possessed by an attorney will filter out to others who could use it to the disadvantage of a client.

Authorities disagree regarding whether the imputation of knowledge from one member of a firm to the others should be extended to non-profit organizations such as legal services agencies and prosecutors' offices. The imposition of vicarious disqualification is premised, in part, upon the community of economic interests among members of a firm who share profits, and those interests are not present in public offices. American Bar Foundation, *Annotated Code of Professional Responsibility* 249 (1979) (Comment on DR 5–105(D)); ABA Formal Op. 342 (Nov. 24, 1975), *reprinted in* 62 A.B.A. J. 517 (1976).

Recognizing these differences, many courts have declined to apply the vicarious disqualification rule devised for civil firms to nonprofit legal organizations, including prosecutors' offices. They reason that the premise of the rule, the free flow of information within a law partnership, is not presumptively applicable outside the partnership context. *See, e.g., United States* v. *Standard Oil Co.*, 136 F. Supp. 345, 360 (S.D.N.Y. 1955); *In re Charles Willie L.*, 132 Cal. Rptr. 840, 843 (Ct. App. 1976). Other courts recognize that "particular caution is in order before an entire prosecutorial office, as distinguished from a particular prosecutor in that office, is recused." *Chadwick* v. *Superior Court*, 164 Cal. Rptr. 864, 867 (Ct. App. 1980). The United States District Court for the District of Arizona disqualified a member of the United States Attorney's office who had represented the defendant in a substantially related matter to avoid the appearance of impropriety, and took the further step of disqualifying the Tucson office of the United States Attorney. It denied, however, the motion to disqualify the entire district office, expressing the view that the prosecution could properly be conducted by the larger Phoenix office, on the rationale that the size and complexity of substantial governmental agencies makes imputation of knowledge impossible. *United States* v. *Catalanotto*, 468 F. Supp. 503, 506 (D. Ariz. 1978).

On the whole, the weight of national authority appears to reject recusal of an entire prosecutorial office. *See Chadwick*, 164 Cal. Rptr. at 871 (canvassing jurisdictions). Federal courts are particularly reluctant to order disqualification

---

[10] As adopted by Arizona, however, DR 5–105(D) has a different scope. It appears to require vicarious disqualification only when an attorney has been recused because of a conflict of interest (Canon 5) rather than the risk of disclosing client confidences (Canon 4). 17A Ariz. Rev. Stat. Ann., S. Ct. Rule 29(a), DR 5–105(D) (1983 Supp.). There is as yet no case law explaining the difference in application between the Model Code and the Arizona amendment.

[11] The Model Rules of Professional Conduct define "firm" as including "lawyers in a private firm, and lawyers employed in the legal department of a corporation or other organization, or in a legal services organization." Rule 1.10 comment, 52 U.S.L.W. 9 (Aug. 16, 1983).

14

of an entire United States Attorney's office. For example, a district court granted a motion to disqualify an entire United States Attorney's office on the ground that one of several defendants had been represented by one of the current Assistant United States Attorneys. The Sixth Circuit reversed, holding that the vicarious disqualification rule of DR 5–105(D) is "inapplicable to other government lawyers associated with a particular government lawyer who is himself disqualified by reason of DR 4–101 . . . or similar disciplinary rules." *United States* v. *Caggiano*, 660 F.2d 184, 191 (6th Cir. 1981) (quoting ABA Formal Op. 342), *cert. denied*, 455 U.S. 945 (1982). As explained by then-District Judge Kaufman in *United States* v. *Standard Oil Co.*, 136 F. Supp. 345, 363 n.34 (S.D.N.Y. 1955):

> [T]he hands of government cannot be tied because of the former associations of one of its officials; therefore, that top person disqualifies himself from handling that particular matter, and the conflict of interest question is considered resolved. Similarly, the particular lower ranking attorney disqualifies himself and another attorney handles the matter. No such opportunity is given to one partner in a law firm to disqualify himself and qualify the firm. The only explanation for the difference in result is that the practical exigencies are more compelling in the former situation than the latter. This is another illustration of the fact that ethical problems cannot be viewed in a vacuum; practical, everyday facts of life must be considered.

The Department would vigorously oppose any attempt to disqualify an entire United States Attorney's office on the basis of a past professional affiliation of one of its assistants because of the extreme interference such a recusal order would cause with the Department's ability to carry out its prosecutorial functions. This position finds support in the ABA's new Model Rules of Professional Conduct. Those rules specifically prohibit a lawyer who is a public officer from participating "in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment, unless under applicable law no one is, or by lawful delegation may be, authorized to act in the lawyer's stead in the matter." Rule 1.11(c)(1), 52 U.S.L.W. 11 (Aug. 16, 1983). The comment states clearly that the paragraph "does not disqualify other lawyers in the agency with which the lawyer in question has become associated." *Id.*

Although we would take the position that a court should not disqualify the entire office, we would urge the AUSA to observe the restrictions upon communicating with others that underlie the vicarious disqualification rule. We have been told that the AUSA has reviewed FBI files regarding A and B. We have no facts to indicate that he may have discussed confidential information with other members of the staff, but we underscore the importance of not assisting in the case once a decision to disqualify has been made.

15

Several sources of authority could be viewed as imposing on the AUSA or other Department of Justice attorneys the obligations of Canon 4 discussed above. As members of the bar of a state or the District of Columbia,[12] Department lawyers may be subject to the ethical standards of the state bars, including Canon 4. Both Arizona and Illinois have adopted the Model Code. *See supra* note 1 and accompanying text. In addition, as representatives of the United States in litigation, Department lawyers may be subject to Canon 4 or a similar rule as adopted by the federal district courts as local rules. The local rules of the United States District Court for the District of Arizona, for example, provide that "the Code of Professional Responsibility, as set forth in Rule 29(a) of the Rules of the Supreme Court of the State of Arizona, shall apply to court proceedings in the United States District Court for the District of Arizona." D. Ariz. R. 7(d) (1982). Finally, the Department's Standards of Conduct exhort Department attorneys to use the Model Code as a source of "guidance" for their conduct. 28 C.F.R. § 45.735–1. Although we have never read this provision in the Standards of Conduct to impose upon the Department's lawyers obligations that are not fully consistent with the performance of their official responsibilities, we must anticipate that the organized bar or the federal courts or both may attempt to impose the restrictions of Canon 4 even in situations where we would not.

The imposition of conduct regulations by a state court or bar association upon federal lawyers acting in the scope of their federal authority must be assessed in light of the Supremacy Clause of the Constitution. *See supra* note 2. The activities of the Federal government are presumptively free from state regulation, unless Congress has clearly authorized state regulation in a specific area. *See Hancock* v. *Train*, 426 U.S. 167 (1976). In the area of professional conduct, Congress has directed that Justice Department attorneys must be licensed and authorized to practice under the laws of a State, territory, or the District of Columbia. *See supra* note 12. In prior interpretations of that requirement, this Department has been willing to assume that Congress "intended that the attorneys would be subject to reasonable conditions of continued bar membership where those conditions are not inconsistent with the requirements or exigencies of federal employment," and that Congress could reasonably have intended federal employees to be subject to "reasonable and established ethical rules for the bar generally." *See* Memorandum of the Department of Justice, Re: "In the Matter of the Petition of the Board of Governors of the District of Columbia Bar," at 5 (Sept. 11, 1979). Nonetheless, bar rules that are inconsistent with the requirements or exigencies of federal service may also offend the Supremacy Clause.

---

[12] Department of Justice authorization and appropriations statutes routinely provide that the Department's funds may not be used to pay the compensation of any person employed as an attorney unless that person is duly licensed and authorized to practice as an attorney under the laws of a state, territory, or the District of Columbia. *See, e.g.*, Pub. L. No. 96–132, § 3(a), 93 Stat. 1040, 1044 (1979); Pub. L. No. 95–624, § 3(a), 92 Stat. 3459, 3462 (1978); Pub. L. No. 95–86, § 202, 91 Stat. 419, 428 (1977); *see also* Pub L. No. 98–411, § 203(a), 98 Stat. 1545, 1558–59 (1984) (continuing the requirement of § 3(a) of Pub. L. No. 96–132).

Whether the limitations of Canon 4, as imposed by a state bar, are a significant enough intrusion into the authorized functions of this Department to offend the Supremacy Clause would depend on the circumstances of the AUSA's case. On the one hand, there is the arguable congressional authorization for at least some state professional regulation of Department lawyers as evinced by the language in the Department's authorization statutes. In addition, the attorney's obligation to preserve client confidences traces its roots far beyond the Model Code of Professional Responsibility, and may have implications for the due process rights of the criminal defendant. Further, the Department's own regulations permit an employee's supervisor to relieve an employee from participation in a criminal investigation or prosecution if he determines that a personal relationship exists between the employee and a person or organization that is substantially involved or has specific and substantial interest in the matter. 28 C.F.R. § 45.735–4. The Department's own practice, therefore, supports observance of the ethical guidelines in this instance.

On the other hand, the Department has a strong interest in pursuing its prosecutions free from interference from any other governmental entity, state or federal. The strength of this interest would depend upon the need for the AUSA's services in this particular operation. That he was hired as a Special Assistant United States Attorney for the purpose of prosecuting alien cases would suggest that his services in the obscenity prosecution are not indispensable. This is a determination that must be made by officials more familiar than we are with the circumstances of this particular investigation.

On balance, we believe that generally the extension of the Canon 4 obligations to individuals who were not "clients" in the strict sense of the word would not be in the Department's interest. We believe in this case, however, that very careful thought should be given to the broad application that courts have given to the Canon 4 principles and a determination made regarding the relevance of those interpretations to the AUSA's situation. We believe the broad construction of Canon 4 is not binding on the Department, assuming some overriding interest on the other side, but that as a prudential matter, the better course may be to protect the integrity of the prosecution by removing the AUSA from the case. Although we can appreciate the AUSA's interest in participating in the case, we think that under these facts it would be reasonable, if perhaps incorrect, for the public or the defendants to question the AUSA's capacity for independent judgment or his ability to preserve the confidences he may have obtained as a defense attorney. As we have emphasized, however, this decision should be made by Department officials who are in possession of more detailed facts than we have been given and who are in a position to judge the AUSA's importance to the investigation and prosecution of these obscenity cases.

## Conclusion

The many considerations, discussed above, that bear upon a disqualification under these circumstances have led us to conclude that the AUSA probably

17

should not participate either in counseling agents involved in the investigation of A and B or in the prosecution of A and B. The relationship between the AUSA and A and B may not be close enough to establish that his participation in the case would violate the Disciplinary Rule prohibiting the disclosure of client confidences. However, it may nevertheless be sufficient to deprive A and B of a fair trial or to create an appearance of impropriety. We cannot conclude that, as a matter of law, the AUSA's participation in the case could not provide a ground for a disqualification order or an eventual attack upon any convictions obtained. As a prudential matter, we therefore recommend that he disqualify himself from the case.

ROBERT B. SHANKS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*